**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VICTORIA JANE AXFORD,** | : | |
| **Petitioner,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MARK STEPHEN AXFORD and ROXY** | : | |
| **ROOKSTOOL,** | : | **No. 09-2914** |
| **Respondents.** | : | |

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

**Schiller, J.**                                                                                          **July 28, 2009**

Presently before the Court is Victoria Jane Axford's Verified Petition for Return of Child to Petitioner. On July 23, 2009, the Court conducted an evidentiary hearing on the Verified Petition. At the conclusion of the hearing, the Court entered an Order granting the Verified Petition and stating that a Memorandum would be issued forthwith.[1] This Memorandum provides the reasons why the Court granted the Verified Petition and ordered the child be returned to the United Kingdom, his country of habitual residence. Additionally, this Memorandum addresses Petitioner's fee petition.

**I.       PROCEDURAL BACKGROUND**

On June 29, 2009, Victoria Jane Axford ("Petitioner" or "Victoria") filed the instant Petition seeking the return of her thirteen year old child, Morgan Lee Axford ("M.A.") to England pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague

---

[1] In a separate Order issued on the same day, the Court granted a motion to dismiss Respondent Roxy Rookstool from this action. Thus, she is no longer a party to this litigation.

Convention"), T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980).[2]  Before effecting service of

the Petition on Respondents, Petitioner filed an Expedited *Ex Parte* Motion for Expedited Service

and Surrender of Passports and Travel Documents.  (Doc. No. 2.)  On July 7, 2009, a hearing was

held before the Honorable R. Barclay Surrick on the *ex parte* motion.  Victoria, who is a citizen of

the United Kingdom and resides in England, testified at the hearing by telephone.  She offered

credible testimony that Respondent Mark Stephen Axford had absconded with M.A., who is autistic,

without the consent of Victoria or the English courts.[3]  In the course of an investigation by police in

the United Kingdom, Victoria learned that Mark had obtained a passport for M.A. under false

pretenses and then traveled to the United States with plane tickets purchased by Respondent Roxy

Rookstool.  On the date of a scheduled return flight to England, Mark Axford married Rookstool in

the United States.  Victoria believed that the couple was residing with M.A. outside of Philadelphia,

Pennsylvania and that Mark had enrolled M.A. in school by representing that Victoria was dead.

In a July 10, 2009 Memorandum and Order, Judge Surrick granted the *ex parte* motion and

directed the United States Marshals Service to serve the Petition and confiscate Respondents'

passports.  (*See* Doc. No. 12.)  The United States Marshals Service served the Verified Petition later

that day and confiscated the passports of M.A and Respondent Mark Stephen Axford.  Rookstool,

a United States citizen, did not possess a passport.  An evidentiary hearing was scheduled for July

20, 2009.  (Doc. No. 12.)

---

[2] Congress implemented the Hague Convention as the International Child Abduction
Remedies Act ("ICARA"), 42 U.S.C. §§ 11601, *et seq*.  *See generally Feder v. Evans-Feder*, 63
F.3d 217, 221 (3d Cir. 1995) (discussing Congress's adoption of the Hague Convention in the
ICARA).

[3] A more extensive recitation of the evidence presented at the July 7, 2009 hearing can be
found in the Memorandum dated July 10, 2009.  (*See* Doc. No. 11.)

On July 13, 2009, Mark wrote a letter to the Court requesting a continuance of the evidentiary hearing and seeking additional time to retain counsel. (*See* Letter from Mark Stephen Axford to the Court, July 13, 2009, included as an exhibit to this Memorandum.)  In the letter, he stated, *inter alia*, that he "had made every attempt in the United Kingdom to pursue every lawful avenue" with respect to custody of M.A., but that he was "finally forced to act in violation of U.K. Law in order to uphold higher laws and responsibilities." (*Id.*)  On July 14, 2009, Brian M. Puricelli entered his appearance on behalf of Rookstool. (Doc. No. 13.)  On July 16, 2009, Hope C. LeFeber, Esquire, entered her appearance on behalf of Mark Axford.[4]  (Doc. No. 14.)  Christopher Furlong, Esquire, thereafter entered his appearance on behalf of M.A.  The evidentiary hearing on the Verified Petition was rescheduled for July 23, 2009.  (Doc. No. 15.)

On July 17, 2009, Mark Axford went to the law office of Attorney LeFeber with M.A. to prepare for the evidentiary hearing.  Before their meeting could take place, the United States Marshals Service appeared in the lobby and arrested Mark pursuant to a warrant issued by Magistrate Judge Elizabeth T. Hey.  The warrant was issued because of an extradition request from the United Kingdom.  The British embassy had submitted a diplomatic note to the United States Department of State formally requesting the extradition of Respondent Axford because of criminal charges in that country, stating that

> Her Brittanic Majesty's Embassy present their compliments to the Department of State and have the honour to request the extradition of Mark Stephen Axford in accordance with the Extradition Treaty between the United States of America and the United Kingdom of Britain and Northern Ireland, and Related Exchange of Letters,

---

[4] In a July 22, 2009 telephone conference with counsel for the parties, Ms. LeFeber informed this Court that she could no longer represent Mark in accordance with the code of professional conduct.  The Court allowed Ms. LeFeber to withdraw from this case but directed that she notify Mark of her withdrawal to allow him an opportunity to find counsel.

3

signed on March 31, 2003 . . . . Mr. Axford is accused of the following two offences: Child Abduction contrary to the Child Abduction Act 1984; [and] Making an untrue statement to Procure a passport contrary to section 36 of the Criminal Justice Act 1925. This is an urgent case because Mark Axford is alleged to have abducted his autistic son to the United States of America. I would be grateful if you could ensure that Department of Justice is aware that Hague Convention proceedings have begun to return the child. I would ask that you make sure that those involved would ensure that extradition and Hague Convention proceedings run in tandem so that when Mr. Axford is arrested for extradition purposes the child is returned under civil proceedings.

(Diplomatic Note No. 71/09, June 24, 2009.)

The United States Marshals Service permitted Ms. LeFeber to contact the court before taking Mark into custody. The Marshals Service was directed to bring Mark and M.A. to the court rather than to a detention facility. Judge Surrick held an emergency hearing on July 17, 2009. Under the circumstances, the Government agreed that detention of Mark was not necessary at that time and that electronic home confinement, pending the extradition proceeding, was appropriate. Detention of Respondent Axford would have resulted in an unstable and potentially traumatic temporary custody arrangement for M.A., a special needs child. Judge Surrick entered an Order accordingly.

On July 21, 2009, this case was transferred to me as the acting Emergency Judge. On July 23, 2009, the Court conducted an evidentiary hearing on the Verified Petition. Unfortunately, prior to the hearing, Mark, in violation of Judge Surrick's Order, removed his electronic monitoring device and left the location where he was staying. He took M.A. with him. As a result, neither Mark nor M.A. were present during the evidentiary hearing.

## II.   FINDINGS OF FACT

The following facts are derived from the record in this case, including the Verified Petition,

the evidentiary hearings and the exhibits admitted into evidence.

### A.   Background

Petitioner has lived her entire life in England.  On December 18, 1993, Victoria and Mark married in England.  Victoria gave birth to a son, M.A., on November 9, 1995.  Mark is M.A.'s biological father.  The couple divorced on October 25, 1999.  M.A. is now thirteen years old and suffers from autism.  As a result of his autism, M.A. has difficulty communicating and interacting in social situations.  Petitioner has no other children.

Prior to the hearing, Craig D. Weiss, Ph.D., a licensed psychologist, performed clinical interviews, observations, and testing on Victoria, Mark, M.A., Rookstool, and Kevin White, Victoria's partner.  He also reviewed school records and a number of letters that Mark submitted on his behalf.  Dr. Weiss prepared a report that was made part of the record; he also testified during the evidentiary hearing.

In his report, Dr. Weiss stated that M.A. suffers from autism and has a reported IQ of 49, which "is equivalent to a mental age of about seven." (Weiss Report at 2.)  According to the report, Mark alleged that Victoria and White abuse drugs and alcohol and were abusive toward M.A.  (*Id*. at 2-4.)  Mark contends that he made repeated allegations to M.A.'s school, social services, and courts in England that his son was being abused, none of which was deemed valid.  (*Id*. at 4.)

Dr. Weiss described Mark as being of average intelligence and "angry, suspicious and sometimes paranoid" about the prospect of M.A. returning to England.  (*Id*. at 5.)  He expressed mistrust of Victoria and told Dr. Weiss that she was manipulative and dramatic.  (*Id*.)  The report further notes that Mark was "contemptuous of mother and fearful of the prospect that the Court may order [M.A.] returned to England.  His mistrust extends to the American Court system, which he

5

believes is railroading him and may possibly allow [M.A.] to return to an abusive mother." (*Id*.) Dr. Weiss characterized Mark as a "probably aloof, rigidly moralistic" man who finds the world to be "a threatening place where he has been unjustly blamed for others' problems." (*Id*. at 5-6.)

Victoria was described as being of average intelligence. (*Id*. at 6.) She denied abusing M.A. and denied abusing drugs or alcohol. (*Id*.) "Although she admits [Mark] has never threatened nor harmed her, she claims to be afraid of him, given his clear anger at her and the fact that he absconded with [M.A.]." (*Id*.) Her partner, Kevin White, was aware of Mark's allegations of abuse. One of White's previous girlfriends submitted a letter that claimed he was abusive when drunk; White "admitted there was some truth to her claims." (*Id*. at 8.)

As for M.A., he was "quite friendly" when Dr. Weiss interviewed and observed him. (*Id*. at 9.) M.A. never initiated conversation and even his answers to open-ended questions were brief. (*Id*.) He often parroted what was said to him, making him appear very agreeable. (*Id*.) Dr. Weiss concluded that M.A. did not engage in "emotional reciprocity" but also concluded that he enjoyed human contact with his mother and clearly bonded with both his father and Rookstool. (*Id*.) He displayed poor verbal expressive skills because of his autism, often confused gender descriptions, and was impaired in his social interactions. (*Id*.) He was also unable to maintain conversation. (*Id*.)

### B.     Custody

Since the couple's divorce in 1999, English courts have entered numerous orders that govern custody of M.A. The most recent order is a Contact and Residence Order dated July 10, 2007, as amended August 1, 2007, from the Yeovil County Court. (*See* Doc. No. 1 [Verified Petition] at Ex. H.) The amended Contact and Residence Order provides as follows:

BY CONSENT IT IS ORDERED THAT

1.    The Child . . . shall reside with the mother and father under joint
      residence order as follows:

    A.    (I)    During school terms [the child] shall reside with his
      mother from Monday after school until the start of
      school on Friday.

        (ii)    During school terms [the child] shall reside with his
      father for the balance (ie) from Friday after school
      until the start of school on a Monday.

        (iii)    On the last Sunday of the month during these times,
      the mother shall collect [the child] at 10:00 a.m. and
      [the child] shall reside with her from then until Friday
      after school whereupon the pattern shall resume as
      above.

(*Id.*)  The amended Contact and Residence Order also provides that Respondent Axford shall not administer certain medicines to M.A.:

> The father shall be prohibited from administering to [M.A.], without the mother's consent, any drug or medicine other than either prescribed by [M.A.'s] GP or other UK registered Medical Practitioner, or any over-the-counter medicines readily available in standard UK pharmacies.

(*Id.*)  This provision was in response to Respondent Axford's efforts to treat M.A.'s autism using homeopathic remedies of which Victoria did not approve, including a September 2006 trip to the United States in which he tried to find an "herbalist" to cure the child's autism.  The amended Contact and Residence Order includes a "warning" that provides:

> Where a residence Order is in force no person may cause the child to be known by a new surname or remove the child from the United Kingdom without the written consent of every person with parental responsibility for the child or the leave of the court . . . .
> It may be a criminal offence under the Child Abduction Act 1984 to remove the child from the United Kingdom without the leave of the Court.

(*Id.*)  A prior order dated September 7, 2006 provided that Petitioner was to keep M.A.'s passport. The September 7, 2006 order was issued because it was revealed that Mark had applied for a passport for M.A. without Victoria's consent.  Victoria has retained M.A.'s passport in accordance

7

with the court order.

**C.   Facts Giving Rise To The Petition**

On Friday, November 14, 2008, consistent with the Contact and Residence Order, M.A. traveled by school bus after school to the home of Respondent Axford. M.A. was to spend the weekend there. Victoria was scheduled to pick up M.A. after school on Monday, November 17, 2008, at which point M.A. would remain with her during the week. Victoria did not attempt to contact Mark or M.A. over the weekend. On Monday, November 17, 2008, Victoria went to the school to deliver M.A.'s lunch box. The school informed Victoria that M.A. was absent that day. Victoria tried unsuccessfully to reach Mark. She then traveled to his house and found that the residence was empty. A sign on the back door stated that the house had been vacated and was subject to a bankruptcy order. Victoria immediately notified the police and filed a missing person's report. She also contacted the passport authority.

Police in England conducted an investigation and notified Victoria that two airline tickets had been issued to Respondent Mark Axford for travel from Bristol Airport in England to New York City. The flight had departed on November 15, 2008, and a return flight was scheduled to take place on February 13, 2009, three months later. Rookstool purchased these airline tickets but was later reimbursed by Mark. Victoria had not consented to M.A.'s removal from England. She therefore contacted the Yeovil County Court to determine if the court had approved M.A.'s departure. On November 28, 2008, the court responded to Petitioner by letter stating, "Mrs. Axford may be advised that no application has been received by the Court for permission to remove the child from the Court's jurisdiction." (Verified Petition at Ex. I.) In the following months, Petitioner continued to communicate with the police in England. The police had begun to coordinate with the Federal

Bureau of Investigation and the Department of Homeland Security.  In December 2008, Victoria filed an application under the Hague Convention with the central authority in London, which advised her not to proceed with the application until it had exhausted its own procedures.  On February 13, 2009, the date of the scheduled return flight to England, Mark Axford and Rookstool married in the United States.

Victoria has since learned that Mark obtained a duplicate passport for M.A. after reporting that the original passport was lost or stolen.  Victoria also learned that Mark enrolled M.A. in a Pennsylvania school and falsely informed school officials that Petitioner was dead.  Mark has not returned to England with M.A., and since their departure in November 2008, the first contact Petitioner has had with her son was on or about July 19, 2009.  Prior to the events that gave rise to this Petition, Victoria and M.A. had never traveled outside of England.  In the Verified Petition, Victoria expressed her belief that M.A. was living with Mark and Rookstool in Bucks County, Pennsylvania.

At the end of April 2009, the central authority in London expedited Victoria's application under the Hague Convention in an effort to secure counsel for her in the United States.  Through this procedure, Victoria retained Elissa Goldberg, Esquire, who now represents her and who filed the Verified Petition and the *Ex Parte* Motion on her behalf.

III.    **CONCLUSIONS OF LAW AND ANALYSIS**[5]

A.      **Legal Framework**

      *1.      Hague Convention*

The Hague Convention is a multilateral treaty on parental kidnapping to which the United

States and the United Kingdom are signatories.  *See* 53 Fed. Reg. 23843 (listing signatory nations);

*see also Mohamud v. Guuleed*, Civ. A. No. 09-0146, 2009 WL 1229986, at *2 (E.D. Wis. May 4,

2009).  The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.*, implements

the Hague Convention and entitles a person whose child has been wrongfully removed to the United

States to petition a federal court to order the child returned.[6]  *See Tsai-Yi Yang v. Fu-Chiang Tsui*,

499 F.3d 259, 270 (3d Cir. 2007) ("A person claiming that a child has been wrongfully removed to

or retained in the United States can commence judicial proceedings under the Hague Convention by

filing a petition for the return of the child in a state or federal court which has jurisdiction where the

child is located.") (citing 42 U.S.C. § 11603(b)).  The Hague Convention reflects a universal concern

about the harm done to children by parental kidnapping and a strong desire among the Contracting

States to deter such behavior.  Hague Convention, Preamble, 42 U.S.C. § 11601(a)(1)-(4).  The

Convention therefore has two main purposes:  "to ensure the prompt return of children to the state

of their habitual residence when they have been wrongfully removed" and "to ensure that rights of

custody and of access under the law of one Contracting State are effectively respected in the other

Contracting States."  *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006) (citations omitted).

_____

[5] The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 11603.

[6] The ICARA provides that "[t]he court in which an action is brought under subsection
(b) of this section shall decide the case in accordance with the Convention."  42 U.S.C. §
11603(d).

Consistent with these purposes, the Hague Convention's procedures are designed "to restore the status quo prior to any wrongful removal or retention and to deter parents from engaging in international forum shopping in custody cases." *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005) (citing *Feder*, 63 F.3d at 221). The Hague Convention is not designed to settle international custody disputes, but rather to ensure that cases are heard in the proper court. *See* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); *id.*, art. 16 (providing that "until it has been determined that the child is not to be returned under the Convention," the state to which the child has been removed "shall not decide on the merits of rights of custody"); *see also Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("[A] United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim."). In short, "the Hague Convention is designed to put all participants in a custody dispute back into the positions they would have been in but for one parent's wrongful removal of the child. It is not, and was never meant to be, a vehicle for determining custody rights." *Carrascosa v. McGuire*, 520 F.3d 249, 260 (3d Cir. 2008).

### 2.    *Wrongful removal*

To secure the return of an abducted child under the Hague Convention, a petitioner must prove by a preponderance of the evidence that "the child has been wrongfully removed" within the meaning of the Convention. 42 U.S.C. § 11603(e)(1); *see also Tsui*, 499 F.3d at 270. A petitioner can establish that the removal of a child is "wrongful" if: "(1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising

those rights at the time of removal." *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) (citation omitted); *see also In re Application of Adan*, 437 F.3d 381, 390 (3d Cir. 2006) (noting same). The Third Circuit has laid out four questions that must be answered in a wrongful removal or retention case: (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention. *Tsui*, 499 F.3d at 270-71.

        3.     *Defenses*

Upon a showing of wrongful removal, the burden shifts to the wrongful remover to establish one of several defenses. *See Adan*, 437 F.3d at 390 (listing defenses); *see also* 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."). In accordance with the Hague Convention, a number of affirmative defenses may apply to prevent a wrongfully removed child from being returned. The respondent may defeat repatriation upon a showing, by a preponderance of the evidence, that: (1) although the proceedings have been commenced after the expiration of the period of one year from the date of the wrongful removal or retention, it is demonstrated that the child is now settled in his or her new environment; (2) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or (3) the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of his or her views. 42 U.S.C. § 11603(e)(2)(B); Hague Convention, arts. 12, 13, 13(a); *Tsui*, 499 F.3d at 278; *Castillo v. Castillo*,

12

597 F. Supp. 2d 432, 439 (D. Del. 2009).  A respondent may also defeat repatriation upon a showing, by clear and convincing evidence, that: (1) there is a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation; or (2) the return of the child would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.  42 U.S.C. § 11603(e)(2)(A); Hague Convention, arts. 13(b), 20; *Bader*, 484 F.3d at 668 (internal quotations omitted); *Adan*, 437 F.3d at 394-95.  The defenses are narrowly construed to further the aims of the Hague Convention.  *Tsui*, 499 F.3d at 271.  Even if the court determines that a defense applies, it retains the discretion to order the child's return.  *Id*.

### B.    Petitioner's Showing of Wrongful Removal

In this case, M.A. was wrongfully removed from England because Petitioner has satisfied the three elements of her *prima facie* case.  As noted earlier, prior to the hearing, and in violation of a court order, Mark fled with M.A.

#### 1.    *M.A.'s Habitual Residence was in England*

First, at the time of removal, on November 15, 2008, M.A.'s habitual residence was in England, Petitioner's country of residence.  The Hague Convention does not provide a definition for habitual residence.  *Feder*, 63 F.3d at 222.  The Third Circuit has held, however, that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."  *Id*. at 224.  "[A] determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there."  *Id*.

Victoria has been a citizen of England her entire life and M.A. was born in England and has lived there his entire life.  In fact, M.A. had never traveled outside of England before the events described in the Verified Petition. Accordingly, England is where M.A. has a "degree of settled purpose."  *See Feder*, 63 F.3d at 222; *see also Clarke v. Clarke*, Civ. A. No. 08-690, 2008 WL 2217608, at * 6 (E.D. Pa. May 27, 2008). Prior to his removal, M.A. attended a school in England that was able to address his special needs.  At the time of removal, Victoria and Mark had no shared intention for M.A. to live anywhere but in England.  They lived with M.A. in England while they were married and even after their divorce both remained in England.  Furthermore, the custody orders in this case evidence Victoria and Mark's clear intent to remain in England.  Indeed, the amended Contact and Residence Order warned that removal of M.A. from the United Kingdom without leave of court may be a criminal offense.  If Victoria and Mark shared a parental intent to have Pennsylvania serve as M.A.'s habitual residence, one would not expect Mark to skulk off to the United States without so much as a word to M.A.'s mother.  Victoria has satisfied this element.

### 2.   *M.A.'s removal was in breach of Petitioner's custody rights*

Second, M.A.'s removal was in breach of Petitioner's custody rights.  Custody rights, under the Hague Convention, "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  *Tsui*, 499 F.3d at 275 (quoting Hague Convention, art. 5(a)).  Although this Court is not empowered to determine who should have custody, a threshold determination of custody rights must be made.  *See Adan*, 437 F.3d at 391-92.

At the time of the removal, Victoria and Mark shared joint custody of M.A. pursuant to an Amended Custody Decree issued by the Yeovil County Court in England.  Petitioner did not consent to M.A.'s removal to the United States.  The Yeovil County Court did not consent to M.A.'s removal

from its jurisdiction.  Petitioner filed a police report immediately after she learned that Mark had absconded with M.A.  The British Government now seeks extradition of Mark on criminal charges related to his conduct.  In a letter to the court, Mark concedes that he acted outside the bounds of U.K. law.  This element is met.

### 3.     *Petitioner exercised custody rights at the time of M.A.'s removal*

Finally, Victoria was exercising her custody rights at the time of M.A.'s removal. Petitioner's burden here is minimal.  *See Tsui*, 499 F.3d at 277 ("Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights.") Petitioner meets her burden upon a showing that she kept, or attempted to keep, some sort of regular contact with the child.  *Id.*  (citing *Baxter*, 423 F.3d at 370).

Victoria discovered M.A.'s removal when she went to school to deliver his lunch box.  The record is devoid of evidence that Petitioner had failed to exercise her custody rights at any point before M.A.'s removal.  Petitioner routinely picked M.A. up from school and regularly asserted her joint custody rights.  The evidence also shows that Petitioner pursued civil and criminal remedies almost immediately after M.A.'s removal.  Victoria clearly exercised her custody rights at the time of M.A.'s removal.  The record is also clear that Petitioner did – and continues to do – everything within her power to be reunited with her child.  This element is satisfied.

Accordingly, Petitioner has shown that Respondent Mark Stephen Axford wrongfully removed M.A. from England, his country of habitual residence.  This Court must therefore order the return of M.A. to England unless Mark can establish one of the affirmative defenses.

### C.     **Respondent Mark Stephen Axford's Defenses**

As noted previously, once a petitioner has proven her case, "the burden shifts to the

respondent to prove an affirmative defense against the return of the child to the country of habitual residence." *Tsui*, 499 F.3d at 271 (quoting *Karkkainen*, 445 F.3d at 288).  The affirmative defenses are narrowly construed and even if a defense applies, the Court retains discretion to order the child's return.  *Tsui*, 499 F.3d at 271.

The only defense that arguably applies here is the "grave risk" defense based upon Mark's allegations, as reported to Dr. Weiss, that M.A.'s return to England would expose M.A. to a grave risk of physical or psychological harm.[7]  Under the Hague Convention, a wrongful removal may nonetheless be justified if respondent can produce clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  *Adan*, 437 F.3d at 390, 395; Hague Convention, art. 13(b).  This "narrowly drawn" exception extends to situations in which a child faces a real risk of physical, sexual or psychological abuse upon return.  *Adan*, 437 F.3d at 395; *see also Baxter*, 423 F.3d at 373.  A respondent must also demonstrate that the court in the country of the child's habitual residence may be incapable or unwilling to adequately protect the child.  *Adan*, 437 F.3d at 395 (citations omitted).

Considering the totality of the circumstances, Mark presented no evidence of abuse at the hands of Victoria or anybody living with her.  The record contains nothing but his unsupported allegations of abuse, as he detailed to Dr. Weiss, allegations that he did not even defend in Court because he elected to abscond with M.A. for a second time rather than appear at the evidentiary

---

[7] Although M.A., who is thirteen years old, is of an age in which he could express his wishes, Dr. Weiss, wrote in his report and testified in Court that M.A.'s autism limits his ability to understand the issues presented and renders him incapable of expressing his wishes in a clear and consistent manner.  Thus, the "wishes of the child" defense is inapplicable.

hearing.  To the contrary, Petitioner presented the report and testimony of Dr. Weiss, a licensed psychologist.  In Dr. Weiss's professional opinion, M.A. "would not be at risk, either psychologically or physically, if he were returned to his mother's care."  (Weiss Report at 11.)  M.A. expressed no fear from either his mother or his mother's partner.  (*Id*.)  Furthermore, Mark's allegations of abuse were raised and dismissed before courts in England.  (*Id*. at 3-4.)  Dr. Weiss believed that statements from M.A. that he was abused and that he wanted to stay in the United States were coached and did not express the reality of the situation or M.A.'s true wishes.  (*Id*. at 11-12.)  In fact, when Dr. Weiss met individually with M.A., M.A. consistently stated that neither his mother nor White had ever hurt or hit him.  (*Id*. at 10.)

Additionally, nothing in the record indicates that the courts of England are unwilling or unable to protect M.A. upon his return.  Mark has failed to show any of the defenses.

## IV.     PETITIONER'S REQUEST FOR ATTORNEYS' FEES

Pursuant to 42 U.S.C. § 11607(b)(3), because this Court granted the Petition, it "shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."

Petitioner has moved for a total award of $14,354.55 for counsel fees, costs, and transportation and hotel costs and has provided support for her request.  Specifically, Petitioner seeks $9,660 for attorneys' fees; $694.55 for costs, including the filing fee, copying, postage and long distance calls; and $ 4,000 for transportation costs and hotel accommodations.  Mark has not

responded to the request for costs and fees.

The "lodestar approach" is the appropriate method for determining the amount of reasonable attorneys' fees. *Distler v. Distler*, 26 F. Supp. 2d 723, 727 (D.N.J. 1998). Under this approach, a court must multiply the number of hours reasonably expended by a reasonable hourly rate. *Maldanado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). A court determines a reasonable hourly rate by assessing the prevailing party's attorney's experience and skill compared to the market rates in the relevant community for lawyers of reasonably comparable skill, experience, and reputation. *Id*.

Petitioner's lawyer, Elissa Goldberg, Esquire, is seeking $150 an hour. The Court finds this hourly rate reasonable. Furthermore, the Court has reviewed Ms. Goldberg's billing statements and finds that she performed her duties in an efficient and expeditious manner. Finally, the filing fee, telephone calls, copying costs and postage were reasonably incurred in furtherance of this litigation. Accordingly, Petitioner's request for $9,660 in attorneys' fees is reasonable and will be approved. Her request for $694.55 for costs is also approved. Petitioner is also entitled to transportation costs related to returning her child to England and hotel expenses incurred in connection with this matter. *See Distler*, 26 F. Supp. 2d at 728-29 (citations omitted); *see Antunez-Fernandes v. Connors-Fernandes*, 259 F. Supp. 2d 800, 816-17 (N.D. Iowa 2003). Petitioner has provided supporting documentation regarding her flight as well as documentation showing that she spent seven nights in a hotel. Accordingly, the Court awards $4000 for travel-related costs and expenses.

Because he failed to appear at the evidentiary hearing, Mark has presented no argument to suggest that an award to Victoria "would be clearly inappropriate." Nor could he. Victoria is entitled to her costs and fees.

18

## V.      CONCLUSION

Based on the record before this Court, the Petition must be granted and M.A. must be returned to the care and custody of his mother so that he can return to England.  An appropriate Order disposing of the fee petition will be docketed.